The next case on the calendar is Retirement Board v. FXCM. Good morning, Your Honors. May it please the Court, Deborah Clark Weintraub on behalf of the Appellant Retirement Board of the Policeman's Annuity and Benefit Fund of Chicago. The District Court's decision dismissing the action must be reversed because it ignored and misapplied controlling precedent of this Court in concluding that none of the alleged misrepresentations and omissions were material and that the complaint did not allege sufficient facts to raise the requisite strong inference of scienter. And let me begin with why the misstatements and omissions were undisputably material. FXCM told investors that it had a business model that was distinct from its competitors. It stated that its agency model reduced FXCM's risk because it had the effect of automatically hedging its positions and eliminating market risk exposure, which FXCM's own SEC filings defined as the risk of loss arising from movements in market prices of the currency pairs. This was false. FXCM's— Wasn't it correct that the straight hedging thing was, in fact, done? And didn't they say that there was a risk due to the collateral and the individual customer failure? Now, on that point, there is the question of whether their statement that they don't usually go after customers is not true because, in fact, they had a contract not to. But the whole previous thing seems to me to be a fairly clear statement of what was going on, that some risk that is normally there wasn't there, but there is this additional risk. And so I'd kind of like you to focus on that one, but maybe the others would like to hear more. Respectfully, Your Honor, I disagree—we disagree that the two sets of transactions hedged for the very reason Your Honor noted, which is that the transaction that FXCM had with the customers— It's different than the principal relationship. This was an agency one, right? And so the principal one is that FXCM is on the other side of the transaction, and therefore there's that risk, which is eliminated by the agency relationship, where the liquidity person is found independently. Well, here there are two sets of transactions, and I think you always have to step back and remember that. They're supposed to be hedges against each other. They're supposed to be, but they're not, and they're not because— They are—they reduce that kind of risk. Suppose the margins are the same, and the likelihood of meeting the margins are the same, and all these other factors are the same. Doesn't that, in a perfect world, mean a perfect hedge? Not in this case, because— I'm not talking about this case. I'm just talking about that part of it. Yes, Your Honor. To eliminate that kind of risk. But then the other risks that we're talking about are the difference between margins and whether the person is going to—you know, whether the person will— difference between the margins between the buyer, the two different sides of the hedge, and that kind of thing. That's a different risk, and wasn't that risk accounted for in the publications by the company? No, Your Honor. That risk was market risk, because FXCM— I'm saying the whole thing is market risk. Yes, Your Honor. With respect to FXCM's transaction with its liquidity providers, it clearly was the counterparty on those trades, and it was exposed to market risk because it did not have a hedge with its customers because the customers were not liable for any amounts— In any event, we're now debating whether something is market risk or is two separate risks, and let's assume that there's something to be said for you, although I'm not sure that it is all the same thing. But in a situation where there's no evidence that they gained anything from it themselves, is this the kind of thing that would be scienter? I mean, for scienter, you need a very direct recklessness. And again, I'd like to focus on that, on the one thing that is a clear misstatement, the question of whether they have a policy or whether there is a contract, because on the other, it's very hard to say that there's a scienter where it is something that, you know, you could call it this or you could call it that. They did tell you what was going on, though they may not have said it in a way that may have been really as clear to everybody as might be. Well, respectfully, Your Honor, we disagree that this debate over whether or not it's market risk or credit risk, as described in FXCM's own filings, is immaterial to this case. This is really the crux of this case. After the events of January 2015, market analysts came out and said that they did not appreciate the nature and level of risk that FXCM was taking. Everybody was surprised. Everybody was shocked. Everybody was. And yet you're trying to say that FXCM was apprised of this risk. But whether or not everyone was shocked at the timing of the S&B's announcement is irrelevant. The relevant question is what was the level and magnitude of risk that existed? And the level and magnitude of risk that existed with respect to FXCM's highly leveraged, unhedged position, $2.2 billion position in this highly volatile currency pair existed all along. Doesn't it come down to that proposition? You're saying that the risk that they shouldn't have taken is that there was this huge amount of investment in this particular currency pair. Because when I look at the 2013 10-K, it does seem to rather clearly say that in situations of extreme volatility, it may be that we will be unable to close out customer positions and we don't have a practice of going against the customers. And that sort of discloses exactly what happened here. What am I missing? It absolutely does not, Your Honor, because what happened here was that FXCM suffered a loss because it was exposed to market risk on its own position with its own liquidity. Counsel, I don't understand why you keep arguing that when that statement of what that risk is was quite clearly made. And the only argument that you have, and it's not a useless argument, is that they said that that risk was there because they have a usual practice of not going after when, in fact, they had a contract. That seems to me your strongest argument, but that isn't the one you're making. Well, Your Honor, we are making that argument, but also I think you have to look at what FXCM said about credit risk, which is the risk that Your Honors are focused on right now. And what they said about it is that it was minimal, that it had historically been insignificant, and that it would occur. That's true. Historically, it had been insignificant. And in these circumstances, for the very reason they described, it became gross. But, Your Honor, based on the allegations and the complaint, it had not historically been significant. We allege in the complaint the incidences involving the Russian ruble and the Japanese yen, where FXCM had suffered such significant losses that the NFA had put them on a watch where they had to report their regulatory capital to the NFA on a weekly basis. So this notion that this was something that didn't happen and was a rare occurrence was not actually true. Well, so when the pair was pegged originally, there was an 8 percent shift in the price. Yes. And how would they have known that this was going to be double that based upon that experience? But, Your Honor, there's no evidence in the record as to what position FXCM held at the time the peg was imposed back in 2011. On the question of that, I'm talking about the price shift, just purely and simply the price shift. Again, Your Honor, whether or not they could predict with certainty when it would occur, how bad it would be, given their $2.2 billion position, a shift of a magnitude of 8 percent would have had largely the same result. They would have suffered a loss as to which they did not have sufficient cash or liquid assets to cover. That's the point. And that's because the risk, again, was of such a magnitude and nobody understood that. Securities analysts said that. Good morning, Your Honors. May it please the Court. We submit that this Court's What your adversary is arguing is that the normal play of disclosures, the normal set of disclosures that you made here, have to be viewed in the light of the exposure of the $2.2 billion and that that's what changes everything. So why don't you address that part? Yes, Your Honor. The $2.2 billion is probably maybe a quarter of the total, close to $8 billion, that FXEM had in positions, that customers had in positions, right? And it's no doubt that it was a big proportion because it was a very stable peg. It was a very stable pairing because of the peg.  The only reason that there's any issue with the risk is the magnitude is if liquidity was not there to allow FXEM to close out customer positions. It said repeatedly from its IPO prospectus in every $10K forward that if there was a situation of extreme market volatility and a lack of liquidity, then it may not be able to close out customer positions, and it would eat those losses because of its policy. That's where my question is. As to that situation, if it were to come about, you said that there is a risk because we do not go after, usually, customers, but in fact, you couldn't go after customers because you had a contract that you would not. Now, my question is why that is a misrepresentation. That is a misstatement. That is to say, we don't usually, when you have a contract, that's a misrepresentation. Is it material? And does it show Center? That's my question. That is, is it the kind of difference that would make an investor choose not to invest? That's what makes it material. And second, if so, is it reckless enough in a situation where there isn't personal gain so that we can meet the Center questions? Yes, Your Honor. An excellent question. But let me take you back a little bit. It is not a misstatement because what the company said about its general policy is true. The contracts were online on the website. The contract had exceptions, a force majeure exception in particular, which the company used in this case because it was a Black Swan event. It recovered some $10 million from some customers. But it makes a choice. A lot of the customers are overseas, retail customers, so it has a general policy of not going after customers. But there is an exception, and it's in the contract, and it was used in this case because it was a force majeure situation. So there is no misrepresentation. There certainly is no C. I would say it's accurate that the vote wasn't a complete statement, but a more complete statement would have been there is a contract, but there is a force majeure, and so we decide, and usually we don't. So it wasn't a complete statement, but it wasn't a clear misstatement. It was not a clear misstatement. I submit that, Your Honor. Correct. And all the customer contracts were on the website and available to you. What do you say to your adversary's point that the fact that the risks are eliminated by the nature of the agency relationship is a misstatement because this is all market risk, and, therefore, the saying that there was no market risk or the market risk was greatly eliminated by the nature of that relationship is misleading? Your Honor, what I would say is I would point them to their own complaint. Their own complaint makes clear at paragraph 7, among other paragraphs, when they say, well, you have exposure to the banks, they always have the caveat, comma, to the extent losses on these trades exceeded the nominal amounts of margin collateral that FXCM required of its retail customers. Essentially, they're saying the same thing. There's no doubt that FXCM does back-to-back trades and hedges, and they're flat. They're neutral to any price movement. But if they can't get their customers out because of their margin watch feature and their seatbelt technology, if there's a lack of liquidity in the market, they can't close out those losses. They're going to eat those losses, and that's the risk that they put in all of their disclosures. And there's really no difference between what the plaintiffs are saying. If you read the complaint, they acknowledge, yes, you might have that risk to the extent you have losses that you can't mitigate, and that's exactly what we say in all of our disclosures. It's the flip side of the same coin. Your adversary's argument is essentially, especially with regard to recklessness, that given that this was a temporary peg, and there might be no basis to say that you knew it was imminent, but by its size alone, there just should have been more disclosure here, and it was reckless not to let investors know how vulnerable the company was to this position. Well, Your Honor, what I would say there, if you looked at the company's point of view, it had seatbelt technology, margin watch features that looked at the accounts three times per second, and over from the time the company went public in 2010 until 2015, the few times they had negative equity losses totaled $2.5 million. And in the 2013 10-K, which is referenced in the complaint, they actually indicate that in 2013 they had only $1.3 million of negative equity, and in 2012 it was $300,000. But their argument essentially is that it's exactly that which misleads the ordinary customer, that somebody in the situation of your client knew that this risk could be dramatic and that there's nothing in this whole set of statements that informs an investor of the size of that risk. And the very fact that history, recent history, made it a minor risk adds to the misleading that what is going on here is that your client knew that there could be a catastrophe and that this whole statement says essentially a catastrophe is not likely. We've done all these things to hedge it. In the end, I think that's the thrust of their argument. I believe that's right, and I would say in response, Your Honor, that there is nothing pled in the Second Amendment complaint or in any of the exhibits that would give an inference that the company had any inkling that there could be a 40 percent drop in the price in a matter of seconds and that liquidity would be unavailable for 40 minutes. I mean, it was a complete dysfunction of the foreign exchange market. So you're saying that maybe the clients were surprised by this risk, but so were you. Absolutely, and it never happened in the foreign exchange market, ever. The biggest events were when the peg was put in in 2011, and Your Honor noticed it was an 8 or 9 percent price movement. And with the Russian ruble, it was a smaller price movement. Their confidential witness number one with his e-mail indicates he thought there might be 100 pips of movement, which is 1 percent. Yeah, but some people saw this danger of the Swiss franc and were already taking steps. And the suggestion is that anybody as sophisticated as your client was ought really to have seen that and said something. That's, I think, what I would say in response, Your Honor, is $100 million in losses that my client suffered clearly indicates the inference that he did not see any catastrophic loss like this, no rational person. He bet on the wrong side. There's no doubt about that. Right, but if you go to the complaint, I mean, given the company's history of performance, the history of the foreign exchange market and the relatively soft price movements, the company was completely confident it could handle the situations. And it had its disaster warning from the IPO forward saying if there is a catastrophic movement, if there is a suspension of liquidity, we could suffer losses. I mean, I think Your Honor mentioned that is exactly what happened here. This is not a matter of no disclosure. I mean, this was what actually happened here was fully disclosed by the company as a risk factor. And that's what Judge Wood saw. If something we don't expect happens, we may go blue. That's what they said. The securities laws are not insurance. They're not investor insurance. There is no fraud here. And Judge Wood, the second time around, when we were up here the first time, the plaintiffs were saying, well, we have all this evidence from the CFTC. We need to get it in front of the judge. Well, they did. And Judge Wood looked at it and not only found no cienter again, found no material misstatements and that the risk disclosures covered everything that happened here. And we submit that is exactly right and she should be affirmed. Yes, I was on the panel that sent it back for potentially bringing in that evidence to see what it would show. Right. And Judge Wood should be affirmed by this Court. Thank you, Your Honors. Just a couple of brief points. Mr. Niv may have suffered losses, Your Honors, but he suffered losses fully aware of what the profile of FXCM was, unlike my client and other investors in the company. And I think we have to step back here for a moment and remember we are here on a motion to dismiss. And the issues before the Court are whether or not Judge Wood was correct in finding that the alleged misstatements and omissions were immaterial as a matter of law, that no reasonable investor could have been misled. And again, I go back to the point that the securities analysts who commented after the events of January 2015 indicated that they had not appreciated from the company's risk disclosures the nature and type of risk and the level of risk that FXCM was taking. In addition, with respect to this force majeure issue in the contract, that is nowhere in the record. So that is a factual argument outside the record before this Court and should not be considered. Well, I don't think there's any doubt that they didn't expect that risk or they wouldn't have invested that way. The question is, did the other side view that risk any more than anybody else did? Whether they expected it or not, Your Honor, is not the issue. The issue is whether or not they misled investors with respect to— It is the issue on CNTR. It is not the issue, perhaps, on whether it's material. With respect to CNTR, the district court clearly applied the incorrect standard. The district court did not consider whether or not the recklessness standard had been met. It is clear that Defendant Niv was in possession of facts that undermined the veracity of the statements he was making to the market. He clearly knew that the company was exposed to market risk. He clearly knew that even if you want to call it credit risk, that risk was very material, the $2.2 billion position. He clearly knew the size of the position. He knew it was a volatile pair. He knew that the cap would be lifted eventually, and he knew when that happened, that would be a huge move, that the price of the franc, which had been artificially capped for years, was going to move, and it was going to move big. He may not have known precisely when it would occur and how much the move was, but he knew that FXCM, sitting there with a $2.2 billion position that was not hedged, was going to suffer a catastrophic loss when that occurred. If FXCM was still holding the bag, and he may have wanted to take that risk, but he didn't have the right to mislead investors with respect to it, and we respectfully submit the decision of the district court should be reversed. Thank you, Your Honors. Thank you both. Also nicely argued. The next case on the calendar is Sacrodote v. Kammack.